# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2347-24

N.T.,

    Plaintiff-Appellant,

v.

R.C.,

    Defendant-Respondent.

_____

Submitted May 13, 2026 – Decided July 2, 2026

Before Judges Mayer and Paganelli.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FV-19-0265-25.

N.T., self-represented appellant.

Askin & Hooker, LLC, attorneys for respondent (Daniel A.F. Benkendorf, on the brief).

PER CURIAM

    Plaintiff appeals from a February 19, 2025 order that dismissed his temporary protective order (TPO) and denied his application for a final

protective order (FPO) against defendant following a hearing. Plaintiff had sought protection under the Victim's Assistance and Survivor Protection Act (VASPA), N.J.S.A. 2C:14-13 to -21.[1] Because we conclude the court's factual findings were sufficiently supported in the record and the court correctly applied the law, we affirm.

We glean the procedural history and facts from the record. On October 21, 2024, plaintiff filed a VASPA complaint for a protective order against defendant. Plaintiff alleged defendant committed acts of stalking, harassment, intimidation, and terroristic threats between June 29, 2024 and October 18, 2024, and checked the box indicating defendant committed or attempted to commit the predicate criminal offense of stalking.

During the October 21, 2024 ex parte TPO hearing, plaintiff testified that defendant "ha[d] properties next door and he set up a security camera so, whenever he s[aw him] out there, he w[ould] come out and harass" him. Plaintiff stated defendant sent him "an email where he was harassing [him] but it was one email so, [he] didn't list" it in his complaint. He requested the court take "that into consideration on . . . cyber harassment." Plaintiff referenced an "additional sheet" that he prepared to chronicle "the dates and the various verbiage" used by

---

[1] We use the parties' initials pursuant to Rule 1:38-3(a)(1).

defendant. Plaintiff described that defendant: would "come up to [his] security camera and yell at" the camera; was a "lunatic yelling at [his] camera"; would "come[] up to the camera and yell[] at the camera" "like five" times; and would "be on his property and come and scream . . . at the camera." In response to the judge's questions regarding whether he "kept contemporaneous notes" of the events, plaintiff replied: "Oh, yeah" and "Yes, ma'am." Plaintiff testified he had video from an October 18, 2024 event, "which [wa]s the reason" he was in court. Plaintiff further testified he had "emotional distress" and was "[a]bsolutely" in fear.

The court found defendant may have committed or attempted to commit cyber harassment and/or stalking based on plaintiff's affidavit, complaint, and testimony provided at the ex parte hearing. The court entered the TPO prohibiting defendant from engaging in certain acts and from entering certain locations.

The FPO hearing was originally scheduled for October 31, 2024, but was adjourned several times at defendant's request. On December 10, 2024, plaintiff amended his complaint to reflect a different timeline of events. Plaintiff listed events between June 28, 2024 and November 9, 2024.

A-2347-24

The hearing began on December 12, 2024. Plaintiff testified that he and defendant had recently become neighbors in a lake community and were having issues concerning their property boundary line. Plaintiff stated defendant had committed cyber harassment and stalking against him "over [twenty-five] times" or "closer to" forty times from June 3, 2024 to October 21, 2024.

Plaintiff stated defendant's conduct began with a June 2024 email to him that included "a number of people" from their community, defendant's attorney, and the New Jersey Department of Environmental Protection, concerning plaintiff's actions regarding the lake and the use of his property. Plaintiff claimed defendant was "outing [him]" and "actually report[ed him] to the authorities for . . . a number of false allegations." The email was admitted into evidence.

Plaintiff testified that on September 17, 2024, defendant and his attorney, Daniel A.F. Benkendorf, trespassed on his property. Plaintiff stated he was not there, but video and still photographs established defendant and Benkendorf "were walking around [his] private property without [his] consent" and Benkendorf "peer[ed] into [his] boathouse windows."

Plaintiff contended that on October 18, 2024, defendant "scream[ed] multiple threats at [him], that included you are a f[***]ing p[***]k." In

4

addition, plaintiff contended defendant "stated[] that he was going to come to [the community's] Board Candidate's [m]eetings and embarrass [him] in ways that [he] could not imagine" given that plaintiff was running for election to the community's Board. Plaintiff stated defendant "was getting more and more aggressive, and this was probably the final straw" for him to obtain the TPO.

The court adjourned the December 12, 2024 hearing after plaintiff stated he wanted to call Benkendorf as a witness in the hearing. The court acknowledged plaintiff produced a photo that depicted Benkendorf on plaintiff's property. The court was concerned that Benkendorf may be disqualified from representing defendant. The court required plaintiff to submit "a proffer . . . regarding why it[ wa]s necessary to call . . . Benkendorf" as a witness.

On December 23, 2024, the court issued a written decision regarding plaintiff's December 20, 2024 proffer to call Benkendorf as a witness.[2] The court noted the New Jersey Rules of Professional Conduct (RPCs) 1.6, "precludes a lawyer from revealing information related to the representation of a client unless there is client consent." The court stated there are exceptions, however, plaintiff's "proffer d[id] not cite any of the applicable exceptions."

---

[2] The record does not include the December 20, 2024 proffer submitted by plaintiff.

Further, the court stated "there are limited circumstances where an attorney can be called as a witness against a client/former client" however, plaintiff's "proffer provide[d] no basis in the context of the alleged VASPA predicate offenses of cyber harassment . . . or stalking . . . which would render testimony identified in the proffer relevant to the matter before this court." Thus, the court denied plaintiff's request to call Benkendorf as a witness against defendant.

The hearing resumed on February 18, 2025, plaintiff's testimony continued. Plaintiff testified that between June 3 and June 23, 2024, defendant committed fifteen "stalking and harassment incidents." Plaintiff stated he did not "record" them or "have them electronically." However, he stated, he "wrote them down but . . . didn't get the dates right."

Plaintiff testified that defendant "became more out of control" and therefore, he "install[ed] security cameras . . . on June 23[], 2024." He stated, five days later, defendant "was caught on the first of many recorded incidents." Plaintiff testified "not all incidents were caught on camera because [defendant] would often yell from his property across the street at" him.

Plaintiff stated that on June 28, 2024, defendant "yelled at [him] from [defendant's] property across the street[,] while [plaintiff] was on [his] dock." He testified that defendant yelled: "I will beat you, you f[***]ing f[****]t."

6

Further, later that day, defendant, while with his girlfriend, yelled:  "Hey [plaintiff], f[**]k you, f[****]t."

Plaintiff testified with regards to a number of incidents occurring in July 2024:  (1) July 1, defendant "walked down his dock and yelled, '[h]ey, . . . f[****]t'" toward plaintiff's security cameras; (2) July 2, defendant "yell[ed] from his property, directed at [plaintiff], '[f***]k you, f[****]t'"; (3) July 3, defendant yelled at plaintiff from across the street and from his property, "[y]ou are a f[***]ing f[****]t"; (4) July 15, defendant was walking down his dock with others when defendant stated, "[y]ou're going to lose, f[****]t"; (5) July 17, defendant "walked down his dock by himself and yelled, '[h]ello f[****]t,'" which plaintiff described was said in a "weird voice"; (6) July 26, defendant stated "[h]ey, [plaintiff], f[****]t"; and (7) July 27, defendant, with his mom present, "yelled from his property, '[y]ou are a f[***]ing a[*****]e.'"

Plaintiff testified that defendant's actions continued into August 2024:  (1) August 9, defendant came across the street and said "I'm going to cut up your boat lift"; (2) later on August 9, defendant "walk[ed] down his dock to his boat and yell[ed] . . . '[h]ey, [plaintiff], f[****]t, loser, loser'"; (3) August 10, plaintiff and defendant were on opposite sides of a public street and defendant yelled, "'I'm going to f[***]ing beat you'"; (4) August 15, defendant yelled from his

7

property, "'[y]ou are a f[***]ing c[**]t'"; (5) August 18 defendant said, "[t]his guy's on my f[***]ing s[**]t . . . he's on my s[**]t, [m]y property"; and (6) August 23, defendant yelled from his house, "'I'm going to f[**]k up your s[**]t.'"

Plaintiff testified that on September 10, 2024, defendant, with his girlfriend present, stated: "'You are a f[***]ing loser.'" Further, plaintiff testified that on September 17, defendant and Benkendorf trespassed on his property. In addition, plaintiff stated on September 21, defendant yelled "across the street at [him], 'I'm going to get you'" and on September 30, defendant stated "[f**]k you, f[****]t."

Plaintiff testified that on October 6, 2024, "[s]omebody [w]as pulling their boat in" and defendant yelled: "'What up? Do you want to put your nose up, scumbag's ladder will f[**]k your boat up, his f[***]ing ladder.'"

Further, plaintiff testified that he was running for a position on the community's Board of Trustees and on October 18, 2024, defendant in a "tirade" "start[ed] going off" saying plaintiff was a "f[***]ing p[***]k, f[***]ing f[****]t" and that he was going to attend a candidates' meeting to embarrass plaintiff. Plaintiff testified that he "filed a [TPO] that essentially kept [defendant] out of those candidates[']	meetings."

Lastly, plaintiff testified that on November 9, 2024, after the issuance of the TPO, defendant and his father were present at the properties and defendant "encouraged" his father to walk on plaintiff's property, in violation of the TPO.

Plaintiff proffered video evidence concerning the incidents from June 28, July 1, 15, 17, 26, August 9, 18, September 17, October 6 and November 9, 2024. Plaintiff testified that defendant's use of the word "f[****]t" was a hate crime and harassing and defendant's actions placed him in fear. He requested the court enter an FPO for his safety.

Defendant cross-examined plaintiff. The cross-examination included plaintiff's testimony during the TPO hearing. On cross-examination, plaintiff testified that despite saying he had taken contemporaneous notes during his TPO hearing, he "actually d[id]n't know . . . the meaning of contemporaneous." Further, although he testified during the TPO hearing that he had video from the October 18, 2024 event, he admitted he did not have it. Moreover, although acknowledging he testified defendant went up "to the camera and scream[ed] directly at the camera," on cross-examination plaintiff stated defendant was "just really shouting, [he] wouldn't say screaming."

In addition, defendant cross-examined plaintiff regarding his testimony and evidence from the FPO hearing. Defendant produced still photographs from

9

July 13 to July 19, 2024, and a cruise receipt for those dates. Plaintiff identified defendant and defendant's girlfriend in the photographs. When asked whose voice was on the July 15 and 17 videos and if defendant was on a cruise, plaintiff stated he made "the assumption" it was defendant on the 15th and "[i]t sounds like [defendant] to me" on the 17th.

Further, defendant cross-examined plaintiff regarding his testimony that defendant's mother accompanied defendant on July 27. When questioned if he knew whether defendant's mom had "passed away," plaintiff testified he "assumed that was his mom" in the video.

Defendant objected to all the videos being admitted into evidence. Defendant argued "they've all been tampered with" and he "was not in some of the videos." The court stated it "heard some concerning things about the videos." The court found "some things that sound like they're in a different voice from other things." Nevertheless, the court admitted the videos into evidence, "subject to whatever arguments [defendant] want[ed] to make about the[ir] weight."

Plaintiff called defendant's girlfriend as a witness. The girlfriend testified that she and defendant were in the video from June 28. She also testified that parts of the voice on the video sounded like defendant's voice but "[t]he rest of

it sounds like a completely different voice." Further, she testified that she never heard defendant call plaintiff a "f[****]t" and never heard defendant "use the word f[****]t."

Regarding the August 9 video, the girlfriend testified that some of the words sounded "kind of like" defendant's voice, but she was unsure about the rest. She testified she did not remember defendant saying the words on the video.

Concerning the October 18 interaction between plaintiff and defendant, the girlfriend testified it was "very brief" and defendant mentioned "something along the lines of . . . go[ing] to court" and "looking forward to going to the meeting where" he could ask plaintiff, "some sort of question." The girlfriend denied defendant said the words "'f[***]ing p[***]k'" or "'f[***]ing f[****]t.'"

Defendant testified on his own behalf. Defendant stated he and his girlfriend were in Fort Lauderdale, Florida from July 12 through 20 on a cruise with her family. Defendant's photographs and cruise information were admitted into evidence without objection. Defendant testified he was not in New Jersey on July 15 and 17, the dates of plaintiff's videos. Defendant also testified he was not in the July 26 video.

A-2347-24

In addition, defendant testified he was in the videos of June 28 and July 1, but the voice on the videos was not his. Regarding the August 18 video, defendant testified he was with a neighbor, not his girlfriend, and they were discussing defendant building a permanent dock. Further, defendant testified that he and his girlfriend were in Manhattan from September 30 to October 3, 2024. Defendant's evidence regarding the Manhattan visit was admitted, over plaintiff's objection, to challenge plaintiff's credibility concerning the dates stated in the initial complaint.

Regarding the October 18, 2024 interaction, defendant testified he was with his girlfriend and he saw plaintiff. Defendant testified he said he "look[ed] forward to seeing you at the Board of Trustee[s] Meeting . . . and I'm looking forward to asking you why you think you're deserving of being a Board Member when you don't even follow our community bylaws."

On February 19, 2025, the court placed its decision on the record. The court found plaintiff's credibility was "to some degree diminished" by his "need[] to us[e] written notes to [testify] . . . about the history of events." The court found it "obvious[]" plaintiff's "recollection of events and dates was not entirely clear."

Further, the court found "plaintiff lost some credibility" when he testified that he kept "contemporaneous notes" after being asked by the court but denied knowing what contemporaneous meant on cross-examination. Moreover, the court found during the cross-examination of plaintiff he "was not cooperative, argumentative[,] and not fully responsive . . . which to some degree undermined his credibility." Overall, the court found plaintiff's "credibility was eroded on cross[-]examination."

In addition, the court stated plaintiff made "assumptions" regarding the videos—"some of the videos where plaintiff clearly identified defendant were not in fact defendant"—and "found [them] to some degree to be unreliable." The court found plaintiff credible regarding "distressing communications" and "defendant ha[d] caused plaintiff some emotional distress."

The court found defendant credibly established that he was on a cruise during the alleged July 15 and 17, 2024 events. The court noted defendant's testimony was supported by documentation including "photographs" and "posts." Further, the court found the girlfriend's "testimony to be credible regarding . . . the October 18th incident." The court noted the girlfriend's testimony was "essentially . . . unchallenged."

13

The court found "that plaintiff ha[d not] established the predicate offense of cyber harassment" because "[t]here were no electronically transmitted threats." The court "note[d] that the boathouse threats were not transmitted electronically or posted. They were delivered in person."

The court found the evidence regarding stalking was in "equipoise which mean[t] that plaintiff ha[d] failed to meet his burden by a preponderance of the evidence." The court concluded "plaintiff failed to meet th[e] preponderance of the evidence standard" regarding stalking, N.J.S.A. 2C:12-10(a)(1), as to "the course of conduct, because [the court was] not convinced that . . . defendant had engaged in all of these activities to create [a] course of conduct" required under N.J.S.A. 2C:12-10(a). The court executed the February 19, 2025 order dismissing plaintiff's complaint and vacating the TPO because plaintiff failed to substantiate his allegations at the hearing.

On appeal, plaintiff contends the court erred in making evidentiary rulings and credibility findings, misapplied the burden of proof, and misapplied and misinterpreted the implicated statutes. He argues that "[e]ven if any individual error could be deemed harmless, the cumulative effect of the . . . court's rulings deprived [him] of a fair adjudication."

In conducting our review of VASPA cases, following a hearing, "[w]e defer to a . . . court's factual findings when supported by adequate, substantial, credible evidence."  A.C. v. R.S., 483 N.J. Super. 47, 53-54 (App. Div. 2025) (quoting C.R. v. M.T., 257 N.J. 126, 139 (2024)) (internal quotation marks omitted).  "That deference is especially appropriate when the evidence is largely testimonial and involves questions of credibility."  Id. at 54 (quoting C.R., 257 N.J. at 139) (internal quotation marks omitted).  "Because a . . . court 'hears the case, sees and observes the witnesses, [and] hears them testify, it has a better perspective than a reviewing court in evaluating the veracity of witnesses.'"  Cesare v. Cesare, 154 N.J. 394, 412 (1998) (alteration in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)) (internal quotation marks omitted).  Thus, "an appellate court should not disturb the 'factual findings and legal conclusions of the . . . judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'"  Ibid. (alteration in original) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).

"Video-recorded evidence is reviewed under the same standard."  State v. Hagans, 233 N.J. 30, 38 (2018).  In Hagans, the Court cited State v. S.S., 229

15

N.J. 360, 381 (2017), for the proposition "that a trial court's fact-finding based solely on a video recording is disturbed only 'when factual findings are so clearly mistaken—so wide of the mark—that the interests of justice demand intervention.'" See also State in Int. of M.P., 476 N.J. Super. 242, 288 (App. Div. 2023) (same).

Nevertheless, simply because "a trial court's factual findings are entitled to deference does not mean that appellate courts must give blind deference to those findings." S.S., 229 N.J. at 381. Instead, we "have an important role to play in taking corrective action when factual findings are so clearly mistaken— so wide of the mark—that the interests of justice demand intervention." Ibid. Our "[d]eference ends when a trial court's factual findings are not supported by sufficient credible evidence in the record." Ibid.

A "court's evidentiary determination is reviewed for abuse of discretion." Schwartz v. Menas, 251 N.J. 556, 570 (2022) (citing Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019)). "Evidentiary decisions are reviewed under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the . . . court's discretion." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). An evidentiary ruling will be overturned only when "a decision is 'made without a

rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

"We review a decision to disqualify counsel de novo." Escobar v. Mazie, 460 N.J. Super. 520, 526 (App. Div. 2019). Nevertheless, "disqualification motions are, . . . viewed skeptically in light of their potential abuse to secure tactical advantage." Ibid. RPC 1.6(a) provides:

> A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for (1) disclosures that are impliedly authorized in order to carry out the representation, (2) disclosures of information that is generally known, and (3) as stated in paragraphs (b), (c), and (d).

Further, "RPC 3.7 prohibits a lawyer, with certain exceptions, from acting as an advocate at a trial in which the lawyer will likely be a 'necessary witness.'" Escobar, 460 N.J. Super. at 528. "[T]he burden of establishing disqualification is on the movant," to show the "lawyer[] will be [a] necessary witness[] at trial." Id. at 529.

"We review questions of statutory interpretation de novo, owing no deference to the legal conclusions of the . . . court . . . ." C.R., 257 N.J. at 139. "We owe no deference to a . . . court's interpretation of the law, and review

17

issues of law de novo. We also review mixed questions of law and fact de novo."

Cumberland Farms, Inc. v. N.J. Dep't of Env't Prot., 447 N.J. Super. 423, 438 (App. Div. 2016) (citations omitted).

Under N.J.S.A. 2C:14-14(a),

(1) Any person alleging to be a victim of . . . stalking or cyber-harassment, . . . may, . . . file an application with the Superior Court pursuant to the Rules of Court alleging the commission of such conduct or attempted conduct and seeking a [TPO].

As used in this section . . . .

     . . . .

"Stalking" means purposefully or knowingly engaging in a course of conduct directed at or toward a person that would cause a reasonable person to fear for the reasonable person's own safety or the safety of a third person, or suffer other emotional distress, because the conduct involves: repeatedly maintaining a visual or physical proximity to a person; directly, indirectly, or through third parties, by any action, method, device, or means, following, monitoring, observing, surveilling, threatening, or communicating to or about a person, or interfering with a person's property; repeatedly committing harassment against a person; or repeatedly conveying, or causing to be conveyed, verbal or written threats or threats conveyed by any other means of communication or threats implied by conduct or a combination thereof directed at or towards a person.

"Repeatedly" means on two or more occasions.

"Emotional distress" means significant mental suffering or distress.

"Cause a reasonable person to fear" means to cause fear which a reasonable victim, similarly situated, would have under the circumstances.

"Cyber-harassment" means conduct that occurs, while making one or more communications in an online capacity via any electronic device or through a social networking site and with the purpose to harass another, that involves: threatening to inflict injury or physical harm to any person or the property of any person; knowingly sending, posting, commenting, requesting, suggesting, or proposing any lewd, indecent, or obscene material to or about a person with the intent to emotionally harm a reasonable person or place a reasonable person in fear of physical or emotional harm to the reasonable person; or threatening to commit any crime against a person or the person's property.

At a hearing for an FPO, "the standard for proving the allegations made in the application for a protective order shall be a preponderance of the evidence." N.J.S.A. 2C:14-16. "Under that standard, 'a litigant must establish that a desired inference is more probable than not. If the evidence is in equipoise, the burden has not been met.'" Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016) (quoting Liberty Mut. Ins. Co. v. Land, 186 N.J. 163, 169 (2006)).

We apply this well-established law to plaintiff's arguments. Plaintiff contends the court barred Benkendorf's testimony, under RPC 3.7, without

conducting "the required balancing analysis" and applying an "automatic" disqualification to permit the testimony. He contends Benkendorf "was a direct participant and a necessary fact witness" and his testimony "was essential to corroborate the conduct visible" in the videos from September 17, 2024. We disagree.

In its written decision, the court applied the RPCs and concluded plaintiff failed to sustain his burden to establish any exceptions to Benkendorf's general obligation not to "reveal[] information related to representation" of defendant. RPC 1.6. Moreover, the court concluded Benkendorf's testimony would not be relevant to plaintiff's claims under VASPA.

Thus, the court conducted the "balancing analysis," plaintiff seeks. Plaintiff's bald assertions that Benkendorf was "a necessary fact witness" and "was essential to corroborate" the videos are belied by the fact that neither defendant nor Benkendorf deny they are depicted on the videos and plaintiff does not assert their verbal interactions were relevant to his VASPA claims. Under these circumstances, conducting our de novo review, we conclude there was no error in denying plaintiff's request for Benkendorf's testimony.

Next, plaintiff contends the court erred in finding his testimony was not credible because the court's findings "rested almost entirely on perceived

demeanor rather than the substantial corroborating evidence presented through authenticated video[s]." There is no merit to this argument. We defer to the court's credibility determinations. See A.C., 483 N.J. Super. at 53-54.

Moreover, the court did not find plaintiff credible because: plaintiff relied heavily on written notes during his testimony; did not have clear recollection of the events and dates; was inconsistent with the word "contemporaneous"; did not cooperate, was unresponsive and was argumentative on cross-examination; and made assumptions regarding the video evidence, including identifying defendant on the videos when defendant was out of state and not on the videos. These are all reasonable considerations in weighing plaintiff's credibility. See Model Jury Charges (Civil), 1.12(K), "Credibility" (approved Nov. 1998) (The factfinder "may believe everything a witness says or only part of it or none of it" by weighing the witness' "demeanor on the stand," "candor or evasion," "willingness or reluctance to answer," and "inherent believability of the testimony.").

Further, the court found defendant credibly established he was out-of-state on the dates plaintiff alleged he was on video in New Jersey and defendant's girlfriend's testimony was credible, refuted plaintiff's testimony, and "was

essentially unchallenged." Given these findings, the court did not abuse its discretion, and we have no cause to disturb its credibility determinations.

In addition, plaintiff argues the court erred when it "questioned the reliability of the video evidence" and "erred by discounting the[ videos] solely because no 'supporting witness' was offered." However, plaintiff's argument misses the mark. The court did not discount the evidence solely on the basis suggested. Instead, the court admitted the videos into evidence, over defendant's objection. However, when the court weighed the video evidence, it found it was insufficient to establish the "course of conduct" required under the stalking statute. The court questioned the veracity of the voices on the videos, did not find plaintiff's testimony credible, and found defendant and his girlfriend provided credible evidence and testimony discrediting plaintiff's claims under VASPA. We have reviewed the videos and other evidence and conclude the court did not abuse its discretion and its findings were sufficiently supported by the evidence in the record.

We next consider plaintiff's arguments the court misapplied the burden of proof and misinterpreted the implicated statutes. Concerning the burden of proof, plaintiff contends the court "effectively imposed a heightened 'beyond a reasonable[]doubt'-like requirement." This contention is disproven by the

record. Our review of the record discloses the court specifically applied the preponderance of the evidence standard as required by VASPA.

Regarding cyber-harassment, plaintiff argues the statute applies "when a person 'communicates online or by means of an electronic device . . . with the purpose to harass.'" (Omission in original). He asserts the court erred in concluding "'[t]here were no electronically transmitted threats,'" because defendant's statements were "aimed . . . at [his] security camera system," an "electronic recording device," which satisfies the statute.

However, plaintiff omits from his analysis the full text of the statute. The cyber-harassment statute requires conduct that occurs "while making one or more communications in an online capacity via any electronic device or through a social networking site." N.J.S.A. 2C:33-4.1(a) (emphasis added). Here, even accepting as reliable the questionable video evidence, there was no testimony defendant's purported comments were made "in an online capacity . . . or through a social networking site." Ibid. In the absence of that evidence, plaintiff's claim regarding cyber-harassment fails. Moreover, plaintiff's reliance on the lone June 2024 email fails because there is nothing in the email that suggests the conduct described in the statute. We conclude there was no error in the court's application of the statute.

Further, plaintiff argues the court misapplied the stalking statute because it "analyzed each alleged incident in isolation rather than considering the cumulative effect." We disagree. Instead, the court weighed plaintiff's questionable videos and his less credible testimony against defendant's and the girlfriend's more credible testimony and concluded plaintiff failed to sustain his burden under the statute. The court weighed all the evidence, correctly applied the statute, and found plaintiff failed to sustain his burden. Under these circumstances, there was no error.

Lastly, plaintiff argues "[e]ven if any individual error could be deemed harmless, the cumulative effect of the . . . court's rulings deprived [him] of a fair adjudication." However, because we conclude there were no individual errors, plaintiff's cumulative error argument fails.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanley

Clerk of the Appellate Division

A-2347-24